Alice D. Guay, Appellant, v. Dr. James T. Neel, Appellee.

Gen. No. 44,905.

Opinion filed March 8, 1950. Rehearing denied March 31, 1950. Released for publication April 3, 1950.

THOMAS J. CAVANAGH, of Chicago, for appellant; MAURICE C. McCARTHY, of Chicago, of counsel.

JOHN M. BEVERLY, of Chicago, for appellee; HARRY Z. SILVERMAN, of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

Alice D. Guay filed a statement of claim in the municipal court of Chicago against Dr. James T. Neel for damage to her automobile which collided with defendant's horse on a state highway. Defendant filed a counterclaim for the value of the horse, which was

killed. A trial by the court without a jury resulted in a judgment against plaintiff on her statement of claim and in her favor on defendant's counterclaim. Plaintiff, appealing, prays that the judgment against her be reversed, and that judgment be entered in her favor, or, in the alternative that such judgment be reversed and that the cause be remanded for a new trial as to the statement of claim. Defendant, who filed a notice of cross-appeal, asks that the judgment in his favor be affirmed, that the judgment on the counterclaim be reversed and that judgment be entered in his favor for $500, or, in the alternative that the judgment against him be reversed and that the cause be remanded for a new trial as to the counterclaim only.

On June 25, 1947, Alice D. Guay, plaintiff, and her husband, Joseph W. Guay, accompanied by Robert E. Hackbart, drove from the Guay's home in Chicago to Grass Lake, Illinois, where they went to bring clothes and food to Mrs. Hackbart. They were riding in a Studebaker automobile owned by plaintiff and driven by her husband. At about 10:00 p. m. they began the return journey to Chicago. Mr. Guay was driving. Mr. Hackbart was sitting alongside of him and Mrs. Guay on the rear seat. The low beam driving lights were on. The weather was clear except for a "little haze" on the side of the road. He was driving in a southerly direction at a speed of forty to fifty miles an hour on Route 83 at the time of the mishap, which occurred at about 10:45 p. m. about one mile north of Ivanhoe in Lake county. Route 83 is a two-lane concrete highway with six-foot shoulders and runs in a northerly and southerly direction. It connects with Routes 59A and 176 at or near Ivanhoe. Route 59A runs in a northwesterly and southeasterly direction and Route 176 in an easterly and westerly direction.

113

There was no traffic on the road and no flares or signals were shown or given prior to the occurrence. Defendant owned two horses which in some manner, not shown by the record, got outside of the fence enclosing his farm and were running loose. At the time the automobile was proceeding on Route 83 in a southerly direction, defendant's horses were running north on the west shoulder of that road. One of the horses was a Tennessee walking horse named "Frosty," twelve years old, fifteen hands high (five feet) and the other was a hackney mare about twelve hands high (four feet). The first view that Mr. Guay had of the two horses was when they came up from the ditch on his right hand side (the west side of the highway) and began crossing the highway. The automobile was then forty feet from the first horse, the mare. He immediately applied his brakes and veered to the right to avoid striking the horses. He avoided hitting the mare, but hit Frosty, which was about six inches behind and to the south of the mare. When the driver collided with the horse his brakes were on and the car was half on and half off the highway on the right shoulder. The car went into the ditch on the right hand side of the road about eight feet from the edge of the highway and about fifteen feet south of the horse. The car was badly damaged. It was towed to Chicago and repaired at a cost of $975. The horse was killed by the impact and the body lay in the middle of the highway.

The mishap occurred on Route 83 at approximately one half mile north of its intersection with Route 59A. Dr. Neel is a dentist with offices in Chicago. He owns and resides on a sixty-two acre farm, the western boundary of which is 100 yards east of Route 83. Ivanhoe is approximately a quarter of a mile west of defendant's farm. The horse was killed at a point on Route 83 about 150 yards north of the north boundary

and about 100 yards west of the west boundary of the farm. Officer Wells, who arrived on the scene after the occurrence, testified that the farm is entirely fenced in with a four-foot woven wire fence. Dr. Neel testified that he has "model fencing, ideal fencing around all of my farm"; that the fence is "hog-tight"; that it is woven wire at the base and barbed wire with three strands on top; that the fence is forty-seven inches high; that steel posts as a part of the fence are set at twelve foot intervals; and that it surrounds the entire farm. There is a wooden farm gate the same height as the fence made of five boards "one by five" with two bracing boards horizontally across the gate to prevent sagging and fourteen feet long. The fence was fastened with wire around the corner post. The open end is chained with a link chain, also called a trace chain. Defendant testified that "it is a chain that is fastened—anyway it is made that way so that no animal can open the gate."

Defendant does not raise horses. He kept the two horses to ride. That afternoon defendant and his daughter were riding the horses. They got through riding at about 4:30 p. m. After unsaddling, "cooling them down," rubbing and watering them, he turned them into "the regular pasture" which is a field of about twenty acres. He said this field "makes an ideal pasture." There is a stable connected with it. He allowed them to remain in the pasture. He stated there is a fence surrounding the pasture, which he described as similar to the fence on his farm. A reading of the record leaves a doubt as to whether the fence surrounding the pasture is an additional fence or part of the fence surrounding the farm. Defendant further testified that when the horses were put into the pasture he closed and chained the gate. He went to bed about 9:00 p. m. and was awakened about 10:00 p. m. by his wife. "A little boy Billy Jenkins" who did

chores for defendant told defendant, after he had put his clothes on, that he, Jenkins, thought he had seen defendant's horses over in his garden. Defendant "couldn't believe" the horses had gotten out. He looked around his farm to verify whether the horses were missing. On ascertaining that "they were gone" he took his farm truck and drove around to see if he could locate them. He drove over toward Ivanhoe. He caught sight of the horses in an oat field immediately to the west of his (defendant's), farm. This oat field was not fenced and lies between defendant's farm and Route 83. Defendant's "idea was to drive them to the north and circle them back to my own farm so they couldn't get on those highways." The horses ran diagonally in a northwesterly direction across the oat field onto highway 83 and started running north on the west shoulder "as fast as they could run." They continued north for about 200 yards. Defendant could see the lights of a car coming from the north. He testified that he "prayed my horses would stay over on the shoulder because they had been scared for some reason or other," that the horses "suddenly veered northeast across that road" and that the car killed the second horse, which was Frosty. Defendant estimated that the car was traveling not under fifty miles an hour and not over sixty miles an hour. Asked whether the automobile slowed down before the impact he replied, "No, he had no chance to do that."

 Plaintiff's action is based on sec. 1 (par. 1, ch. 8, Ill. Rev. Stat. 1949 [Jones Ill. Stats. Ann. 5.001]) of "An Act in relation to domestic animals running at large within the State of Illinois," as amended by Act approved May 25, 1931, reading:

"Hereafter, it shall be unlawful for any animal of the species of horse . . . to run at large in the State of Illinois: Provided, that no owner or keeper of such animals shall be liable for damages in any

civil suit for injury to the person or property of another caused by the running at large thereof, without the knowledge of such owner or keeper, when such owner or keeper can establish that he used reasonable care in restraining such animals from so running at large."

In *Fugett v. Murray,* 311 Ill. App. 323, the court, discussing the history of the statute and the purpose of the amendment, said (326):

"The proviso in the statute was added in 1931. As a consequence of the enactment of section one as it now stands, without the proviso, the law of the State of Illinois required the owner or keeper of stock, named in the statute to keep them from running at large on the public highways. The owner or keeper was liable in a civil action for damages resulting from his stock being loose on the highway even though he did not know the stock was so at large. It was not necessary for the plaintiff in such an action to allege that the owner or keeper negligently and unlawfully permitted his stock to be at large on the public highway. (*Farrell v. Crawford,* 222 Ill. App. 499.) Every animal of the species named in the statute is running at large unlawfully if it is on the public highway unattended, unrestrained and uncontrolled. (*Farrell v. Crawford, supra; Bulpit v. Matthews,* 145 Ill. 345; *Morgan v. People,* 103 Ill. App. 257; *Donaghue v. Fraikin,* 200 Ill. App. 339.) It is our opinion that the proviso was passed by the legislature to relieve the owner of stock of the harshness of the law, as declared in the *Farrell* case. Under the proviso the owner or keeper of stock may show in a civil action against him for injury caused to a person or property resulting from his stock running at large on the highway, that without his knowledge the stock was so at large, and that he used reasonable care to restrain the stock from being at large."

117

The burden was on plaintiff to prove her case by a preponderance of the evidence. She made out a prima facie case. The proof to be established under the proviso was within the knowledge of the defendant and not the plaintiff. Having made out a prima facie case, the burden of proceeding shifted to the defendant. The burden of proof remained, however, on the plaintiff. Plaintiff maintains that the judgment is against the manifest weight of the evidence. We are of the opinion that the evidence supports the finding and judgment of the court. It is patent that the horses were not running at large within the meaning of section 1 of the Act, as amended. There was evidence that defendant placed the horses in the pasture and closed and chained the gate and evidence from which the court had a right to find that the fence and gate were adequate for the purpose of restraining the horses. There was no evidence to the contrary. At the time defendant retired at 9:00 p. m. the horses were fenced in on the farm. He was not required to keep them in the stable. Allowing them to remain in the pasture could not be considered negligence. He had no knowledge that the horses were outside the enclosure of his farm until he was awakened at 10:00 p. m. He was not required to remain awake to watch the horses or to hire watchmen to do so. On discovering that the horses were loose he immediately endeavored to locate them so that he could cause them to be returned to his farm. He was endeavoring to come up to the horses at the time the impact occurred. From this evidence the court had a right to decide that there was no proof of violation of the statute and that the proof showed that the horses were outside of the fence without his knowledge. The proof further shows he used reasonable care in restraining the animals from running at large. On cross-examination defendant stated that he "had no idea at the time" how the horses got out,

118

but that he "learned later how they escaped." Following this testimony the attorney for plaintiff stated: "We will go into that later on." The matter was not gone into further. Whether testimony as to what was later discovered by defendant as to how the horses escaped would help to resolve the issues in this case, is a matter of speculation. The word "knowledge" used in section 1 of chapter 8 refers to knowledge that the owner or keeper had at the time and not of knowledge acquired subsequently. Billy Jenkins was not called as a witness, was not in court and no evidence was introduced that he was unavailable. Plaintiff states that "in these circumstances, we believe it is proper to say that had such witness's evidence been favorable to the defendant the latter would have produced the witness." There was no evidence that the Jenkins boy was within the control of the defendant, or that he could enlighten the court as to how the horses escaped. We find that the case on the statement of claim presented a question of fact which the court properly resolved in favor of defendant. The evidence did not show that the horses were running at large within the purview of the statute. The finding and judgment of the court were not against the manifest weight of the evidence.

We also believe that the court exercised sound judgment in disposing of the counterclaim. There was evidence that plaintiff's husband was driving with due care and with the lights on and that the horses suddenly ran upon the road. The court had a right to find that the impact in which Frosty was killed was not proximately caused by the negligence of the driver of the car. For the reasons stated the judgments of the municipal court of Chicago are affirmed.

*Judgments affirmed.*

Lewe, P. J., and Kiley, J., concur.