Lester Johnson, Ivan Neahring and Lyle Hanson, Plaintiffs-Appellees, v. Frank Sleaford, James Thompson and Leonard Crossell, Defendants-Appellants.

Gen. No. 11,646.

Second District, Second Division.

February 19, 1963.

Rehearing denied March 7, 1963.

Bozeman, Neighbour & Patton, of Moline, and William N. Stone, of Sterling (John V. Patton and William N. Stone, of counsel), for appellants.

Roger V. Pierson, of Princeton, for appellees.

CROW, J.

This is an action by the plaintiffs against the defendants based upon Ill Rev Stats 1959, c 8, § 1, which reads as follows, so far as applicable:

"Hereafter, it shall be unlawful for any animal of the species of . . . cattle . . . to run at large in the State of Illinois; Provided, that no owner or keeper of such animals shall be liable for damages in any civil suit for injury to the person or property of another caused by the running at large thereof, without the knowledge of such owner or keeper, when such owner or keeper can establish that he used reasonable care in restraining such animals from so running at large."

The defendants were charged with not making adequate provision for keeping and retaining certain cattle on their premises, which roamed at large from July 24, 1960, the day of their escape, to January 1, 1961, when the last thereof were recovered, and which allegedly damaged certain crops of the plaintiffs. The jury rendered a verdict for the plaintiffs, separately assessing their respective damages, upon which the court entered a judgment for $788.50, $794.-50, and $1206 for the respective plaintiffs, from which this appeal is taken by the defendants. The defendants' motions for directed verdict at the close of the plaintiffs' evidence and at the close of all the evidence were denied, and their post trial motion for judgment

231

■■■■■■■■■

notwithstanding the verdict and for new trial was denied.

It appears from the evidence that the defendants James Thompson and Frank Sleaford operated a farm and cattle enterprise in Bureau County, Illinois, jointly with the defendant Leonard Crossell, and that on Saturday, July 23, 1960, Thompson and Sleaford went to Carbon Cliff, Illinois where they inspected and purchased thirty-five head of Black Angus cattle. They drove the cattle from one pen to another while making their examination and inspection. At this time, the cattle apparently were tame, did not seem unruly, were normal, and appeared no different than any other cattle. They had an average weight of 480 pounds. On Sunday, July 24, 1960, the cattle purchased were transported to the farm where the defendants conducted their cattle operation and were unloaded, about 9–10 a. m., into a corral about 200 square feet in size. During the loading process they did not seem unruly. During the unloading nothing out of the ordinary occurred.

The corral had been holding other feeder cattle which had been removed in order to put the newly acquired cattle in. It was a cement corral lot. The fence around the corral was constructed of one inch by twelve inch boards with wood posts of six inch creosote, four and one-half feet high with the boards vertical,—there were solid boards all the way around. The gate was about fifteen feet wide and was secured with double strands of barbed wire at all four corners. It was not hinged. It was constructed of one inch by six inch boards. When last seen at 11:30 a. m. that Sunday morning the cattle were standing normally in the corral.

On the same day, however, July 24th, the cattle broke down the gate, sometime before 12:30 p. m., broke through a four strand barbed wire fence by jumping into it, and then broke through a third en-

closure, a three strand barbed wire fence. The top wires that secured the gate at the corral had been snapped and the cattle had pushed the gate down so it was lying flat. One of the defendants said or testified, in part, that he knew cattle just crowd sometimes, his tame milk cows had sometimes crowded gates down, there was a tendency of cattle to crowd, and we should have locked them in the barn for a couple of days. No one was in attendance at the corral when the cattle broke out. One of the defendants said the cattle got out by crowding.

Thompson discovered the cattle when they had broken through one enclosure and tried unsuccessfully to head them back. They scattered and went in different directions and upon various properties. He, together with Sleaford and other persons who were hired and who volunteered to assist, made efforts that day and subsequently to recapture the animals with horses, trucks, jeeps, and an airplane. They made efforts to comb the neighboring corn fields, driving the roads, and going through timber trying to locate the cattle and drive them to a place where they could be corraled. Some of the cattle stayed in the growing corn until after picking time because there was no place to corral them. The sight of the searchers scared the cattle and they ran farther away. Nine persons were involved in the search. Seven head were recaptured during the first week, and in the first two weeks about twelve head were recaptured. Some were recaptured by a veterinarian shooting them with a rifle containing tranquilizer drugs. The search covered about 22 square miles. Three weeks from the day of the escape twenty-two head were still at large, and one-half of these were on the fields of the plaintiffs. The last of the cattle were not returned to the defendants until the first of January, 1961, more than 5 months after they had escaped. The plaintiffs sought damages for

233

the loss, damage, and destruction of and to their growing oats, soybeans, and corn by these cattle.

It is admitted by the defendants that the cattle were actually running at large and that the plaintiffs had thereby established a prima facie case, but the defendants argue that the plaintiffs offered no competent evidence to show that the defendants did not use reasonable care in restraining the cattle, that the cattle escaped without their knowledge, that they had used reasonable care to restrain them, that there is no evidence to the contrary, that the Court erred in admitting certain improper evidence as to damages, over their objections, and there is no proper evidence as to damages. They urge that their post trial motion for judgment notwithstanding the verdict or for new trial should have been granted.

The plaintiffs' theory is that the verdict is amply supported by the evidence, and is according to law. They say the defendants failed to provide reasonable care to restrain the cattle and permitted them to run at large after having knowledge of their escape.

 We believe it was properly a question of fact for the jury to determine whether the defendants used reasonable care, under all the facts and circumstances in evidence, in restraining the cattle from running at large. Cattle are running at large, under the statute, if they are unattended, unrestrained, and uncontrolled: Fugett etc. v. Murray (1941) 311 Ill App 323, 35 NE2d 946. Under the statute, if the cattle were running at large, as is here established and apparently admitted, that was unlawful. The general rule is that where an accident occurs as a proximate result of the violation of the statute making it unlawful for stock to run at large, there is a presumption of negligence on the part of the owner and keeper of the stock, which is, normally, sufficient to carry the case to the jury so far as that issue is concerned: Fugett etc. v. Murray, supra. As to whatever, if any, damages for injury to prop-

234

erty of the plaintiffs may have been proximately caused by the running at large thereof, if and assuming that such was without the knowledge of the defendants owners, the defendants owners are not liable "when such owner or keeper can establish that he used reasonable care in restraining such animals from so running at large." If the defendants cannot so establish that they so used reasonable care they are liable. The defendants claim the benefit of the proviso in the statute; the proof to be established under the proviso was within the knowledge of the defendants and not the plaintiffs; and the burden of evidence, after the plaintiffs rested their case in chief, was on the defendants: Fugett etc. v. Murray, supra. It was a question of fact for the jury to determine whether the evidence introduced by the defendants was sufficient to overcome the prima facie case made by the plaintiffs; the credibility of the witnesses and the weight to be given their testimony were questions to be determined by the jury; the inferences to be drawn from the evidence were matters for the jury; it was their peculiar province to determine the preponderance of the evidence; upon the defendants' motions for directed verdict and their post trial motion for judgment notwithstanding the verdict the plaintiffs are entitled to all favorable inferences legitimately arising from the evidence: Fugett etc. v. Murray, supra. And see: Guay v. Neel (1950) 340 Ill App 111, 91 NE2d 151. The motions for directed verdict and for judgment notwithstanding the verdict presented the single question whether there is any evidence which, standing alone and taken with all its intendments most favorable to the plaintiffs, tends to prove the material elements of the plaintiffs' case: Lindroth v. Walgreen Co. et al. (1950) 407 Ill 121, 94 NE2d 847. We think there is, and that there is no complete absence of probative facts to support the inference drawn by the jury here. Hence, the Court

properly denied the defendants' motions for directed verdict and for judgment notwithstanding the verdict. We have considered, and do not believe applicable here, other cases the defendants cite on this, namely: DeBuck v. Gadde (1943) 319 Ill App 609, 49 NE2d 789; Blakley et al. v. Glass et al. (1950) 342 Ill App 90, 95 NE2d 128 (abstract decision), Myers v. Lape (1901) 101 Ill App 182, and Kinder v. Gillespie (1872) 63 Ill 88.

 On the issue of damages, the plaintiffs' witnesses testified generally as to the number of acres or percentages of crops or number of bushels of grain lost or damaged by eating, trampling, etc., the kind of crops lost or damaged, the average probable yield per acre of the respective crops of oats, soybeans, or corn, the market prices at the time of maturity, and in some instances the number of bushels actually harvested from a damaged tract. Each plaintiff produced testimony as to the loss or damage that he suffered, all of which was in the area of the money damages claimed and allowed. They say this is the only type of evidence of damages that could have been submitted under the circumstances. The defendants urge that all of such evidence was improper and incompetent and the Trial Court should have sustained their objections to such, that in an action for damages to unmatured crops it is improper to allow evidence of market value of matured crops, and unmatured crops have no value on the market. The abstract discloses that the defendants' attorney, when asked by the Court to state the nature of his objections to this line of evidence, said at one point: "there has been no evidence here that any of these crops were matured crops. If they were unmatured crops they have no market value as such, and there is no evidence that these crops were matured, and, therefore, the matter of market value or yield is immaterial to unma-

tured crops . . . I think it must be established what the stages of growing were at the time of damage, the depreciation in value before and after the alleged injury, the condition at the time of the alleged damage."

The evidence discloses that these cattle were all running at large on July 24, 1960, and for varying times thereafter for several months, that they either ate, or trampled, and destroyed at different times parts of growing crops of oats, soybeans, and corn, that most of the crops at and during that time (except possibly the oats) were not fully matured, and that the destruction, in part, continued until the corn was picked.

 The plaintiffs were entitled to plant, cultivate, mature, and harvest their crops,—to secure the full benefit to arise from the annual harvest according to the season; evidence tending to show how much the land would yield, and as to the usual market value of the product at the usual market, at the harvesting season, was admissible; out of this it was proper to deduct the expense of tillage, harvesting, and marketing; the remainder is the legitimate fruit of the land, labor, and expense; the measure of damages is the worth of the growing crops at the time they were destroyed, not for immediate use in the condition they then were, but with a view to the use of the ground until maturity, with the right to cultivate and harvest the crops; this is ascertained by the probable amount of grain the crop would produce, and the probable value of the same in the market at the market season, deducting therefrom the necessary cost of cultivating, harvesting, and taking the same to market; the amount and value are necessarily hypothetical and an opinion thereon can only be formed by considering the average yield at the place and under like circumstances and the average value of the products in the

237

market at the place and time of market: Chicago and R. I. R. R. Co. v. Ward (1855) 16 Ill 521. For immediate use as such the immature crops as such may have had, theoretically, no value at all, but the proper method of establishing the market value of growing crops is to determine the value of the crops as they were when destroyed, together with the value of the right which the owners had to mature the crops and harvest them at the proper time, and that, we believe, is what the witnesses on this point here were endeavoring to state: St. Louis Merchants' etc. Assoc. v. Schultz (1907) 226 Ill 409, 80 NE 879. That value was necessarily a matter of estimate or conclusion of the mind of the witnesses to be arrived at from all the material facts which would affect it, including the quality of the land on which the crops were growing, its fertility, and productivity: Economy Light etc. Co. v. Cutting (1893) 49 Ill App 422,—and including the probability or improbability that a particular crop would mature on a particular tract: Chicago and N. W. Ry. Co. v. Stroud et al. (1906) 129 Ill App 348. Zuidema v. Sanitary District etc. et al. (1921) 223 Ill App 138, referred to by the defendants, adheres to the general rule that the measure of damages to growing crops which are not matured is the value of the crop as it was when destroyed, with the right of the owner to mature and harvest it at the proper time, but the comments in the opinion that evidence as to probable yield and probable market value at maturity did not comply with the general rule seem not in keeping with the other cases. Libbra et al. v. Mt. Olive etc. Coal Co. (1961) 29 Ill App2d 396, 172 NE2d 813, also referred to by the defendants, similarly adheres to the general rule, and the references in the opinion that probable yield and probable market value at maturity were not proper elements for consideration in proving damages are dicta because no objection had been made

238

to such evidence, the point had not been passed on in the trial court, and it was not decided by the Appellate Court.

Accordingly, considering the continuing, day to day, nature of trespass and damage by these cattle, considering the character of the products, growing crops, to which damage was done, and considering all the relevant facts in evidence, we believe the Court did not err in overruling the objections which the defendants made to the evidence as to damages and properly denied the motion for new trial.

The judgment will, therefore, be affirmed.

Affirmed.

WRIGHT, P. J. and SPIVEY, J., concur.