(No. 82-CC-1217-

PAUL SHEEDY, Executor of the Estate of Alice Sheedy, deceased, IRENE BROWN, STEPHAN B. MANN, ROBERT J. CALHAN, PATRICIA ANDERSON and RALPH ANDERSON, Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed July 28, 1989.*

ARMSTRONG, SURIN & ENGELS, for Claimants.

NEIL F. HARTIGAN, Attorney General (CLAIRE TAYLOR, Assistant Attorney General, of counsel), for Respondent.

MONTANA, C.J.

This claim was brought by several landowners seeking compensation for damage caused by flooding of farmland adjoining the Illinois & Michigan Canal (I & M Canal) in Grundy County, Illinois. The case proceeded to hearing, briefs were filed, the Commissioner has duly filed his report, and oral arguments were held before the Court.

The flooding incidents occurred on September 8, 1980, and June 13, 1981, when, as a consequence of rainstorms, the south levee of the canal was overtopped and gave way at various points causing flooding of the farmlands owned and/or managed by the Claimants. During the September 8, 1980, incident a 50- to 75-foot break occurred in the south levee adjacent to the property owned by Irene Brown.

In Claimants' complaint and amended petition, they allege the State was negligent with reference to the I&M Canal in that the State:

(a) failed to properly inspect said south levee,

(b) permitted said levee to erode to such height as to be insufficient to control the flowage of water in said canal,

(c) failed to properly maintain the canal so as to permit an adequate flow of water to be maintained in said canal,

(d) permitted the south levee of said canal to be undermined,

(e) diverted water from other than its course of natural drainage which it permitted to flood and inundate petitioners' lands,

(f) failed to contain the waters of the I&M Canal entirely within the boundaries of said canal, and

(g) failed to properly redesign the Canal prism between Carson Creek and the Waupecan Island Spillway in 1951.

The Claimants also make a strict liability claim contending that under the provisions of section 8 of An Act to revise the law in relation to the Illinois and Michigan canal (Ill. Rev. Stat., ch. 19, par. 8) (the Act), the Department of Conservation had control and management of the I&M Canal, that under the provisions of section 9 of the Act (Ill. Rev. Stat., ch. 19, par. 10), the Department of Conservation was required to keep the canal in good and sufficient repair, and that the provisions of section 23 of the Act (Ill. Rev. Stat., ch. 19, par. 70) mandate that the State:

"* * * prevent the carrying capacity of streams to be limited and impaired by fills, deposits, obstructions, encroachments therein, deposit of debris or material of any kind, including trees, tree limbs, logs, shrubbery, or related growths and trimmings therefrom in or upon the bank of any waters and water courses or in such proximity to such waters and water courses or any tributary thereto where the same shall be liable to be washed into or deposited along such waters and water courses, either by normal or flood flows, as a result of storms or otherwise, which may in any manner impede or obstruct the natural flow of such waters and water courses * * *."

Notwithstanding the provisions of said statutes, Claimants assert that responsible agencies of the State failed to

comply with said statutory provisions between January 1, 1950, and the date of the occurrences alleged, resulting in the damage complained of by Claimants.

It is not disputed that the State does own, operate and maintain I&M Canal primarily as a recreational area. Historically, the canal was created in this area in 1848 and was dredged in 1871, and from that time continued to fall into disrepair until 1933 when it was officially closed to navigation. In 1974, the maintenance and control of the canal was delivered to the Illinois Department of Conservation. Prior to 1974, the Department of Public Works and Buildings (later known as the Department of Transportation) had jurisdiction over the canal.

Over the years the canal has attempted to handle the flow of floodwater from the north in the watershed area of Carson Creek and also Rat Run. In 1951, an earthen dam was placed across the canal which prevented any Carson Creek drainage from flowing to the west toward Seneca and forced all runoff to flow east toward the Waupecan Island Spillway. Also, in 1951, a 4.9-mile reach of the I&M Canal was dredged from the mouth of Carson Creek to the Waupecan Island Spillway.

There is a report in the record issued by the Illinois Department of Transportation Division of Water Resource Bureau of Planning entitled *Investigation of Flood Problems—Phase I—Illinois and Michigan Canal between Carson Creek and Waupecan Island Spillway.* This report, which was submitted at trial without objection as Claimants' Exhibit 1, indicates that from 1951 to 1981, or since the earthen dam was placed to the west of Carson Creek, approximately 90,100 cubic yards of silt from Carson Creek has settled within the canal prism. The report further states as follows:

"Near the mouth of Carson Creek the depth of canal siltation is about five feet higher than the 1951 post-dredging elevation. Relatively fast flowing (and silt laden) water from the Carson Creek basin empties into the very flat I&M Canal and slows down very suddenly, allowing the sediment in the water to settle to the bottom. As can be expected, this extensive sedimentation process has gradually reduced the flow capacity of the canal.

Also, since the last dredging operation in 1951, lack of an annual maintenance program has allowed a heavy growth of vegetation to develop along both banks of the canal. Trees and dense brush tend to increase the amount of flow resistance and, in this instance, are a major cause of undesirable flood levels.

The concrete spillway at Waupecan Island is also a major cause of overbank flooding to the west. The size of the spillway structure is certainly adequate to pass large flood flows, but the height of the crest produces upstream flood problems. The crest of this spillway was constructed approximately 2½' below the canal towpath in order to maintain canal water at a navigational height. As can be seen on Plate 3, the spillway elevation controls the starting water surface elevations and creates a backwater effect that is carried upstream toward Carson Creek." (pp. 5, 6.)

It appears Respondent was aware as early as 1973 that drainage problems existed in the section of the I&M Canal relevant to this claim. As part of the departmental report submitted by Respondent pursuant to section 14 of the rules of this Court (74 Ill. Adm. Code 790.140) is a memo dated May 29, 1973, discussing overflow of the I&M Canal. The relevant portion of the memo states:

"The problem of overflowing seems to stem from a creek flowing into the canal approximately 1½ miles from the area of the washouts. This creek is called I believe, Carsons Creek and is the drainage for the surrounding area. When a hard rain falls in the watershed of this creek, it becomes swollen and dumps a large volume of water into the canal. The day that I visited the area there was evidence of debri (*sic*), approximately 4 ft high in the surrounding area and shrubery (*sic*), indicating that the creek had overflowed its banks. This debri (*sic*) was also found approximately 2 miles from the creek, but was not in evidence further East. This creek, when flooded empties such a large volume of water and has such a tremendous amount of head pressure that it fills the canal in the immediate area, until it spills over at some point."

Claimants' expert witness Robert E. Renwick, a civil engineer, testified that in his opinion the canal drainage system was improperly designed when it was changed in 1951. He further testified that between 1951 and

September 8, 1980, the canal in the area in question was not properly maintained with respect to dealing with siltation and vegetation. When Respondent's expert witness, Dr. Misganaw Demissie, also a civil engineer, was asked by Claimants' counsel if, based on studies of various documents, particularly Claimants' Exhibit 1 which was referred to previously, he had an opinion as to whether Respondent had performed adequate maintenance on the I&M Canal so as to prevent damage to adjoining lands, Dr. Demissie indicated the chance of a breakout would have been less if the levee had been kept in "tiptop condition." Dr. Demissie also indicated that the accumulation of silt could have an impact on the canal's ability to carry water. Dr. Demissie further stated:

"[I]f you look at the documentary history, they talk about overtopping, flooding problems. The reason—probably the reason was they didn't design it to carry flood waters. You know, 2-and-a-half feet free board, that's not a whole lot of area to carry flood waters ° ° °

Q. (Mr. Armstrong) What you are saying then is that the design was inadequate when it was originally built to protect the adjoining landowners because of the low free board?

A. (Dr. Demissie) There are many other points also.

Q. But that's one?

A. That's one. The other one, as you know, it is above ground a lot of places, and, you know, when you have that, you know, you got problems." (Tr. 758, 759.)

After a thorough review of the record in this matter, it appears to this Court that when Respondent placed the earthen dam to the west of the mouth of Carson Creek in 1951 which prevented Carson Creek drainage from flowing west toward Seneca and forced all runoff to flow east to the Waupecan Island Spillway, it had a duty to maintain the canal in a manner which would provide adequate drainage and prevent overtopping and breakouts. The evidence indicates Respondent did little to deal with the siltation and vegetation problems

of the canal. We find that lack of proper maintenance led to the overtopping and breakouts which caused the flooding of the farmlands owned and/or managed by the Claimants and that Respondent is liable for damage caused by the flooding. Having found that the State was negligent with respect to the maintenance of the canal, we do not find it necessary to rule on whether the canal design was improper or on Claimants' allegations based on strict liability.

The next question to consider is the proper measure of damages for growing crops. The first occurrence on September 8, 1980, presents little problem in assessing because these crops were "made" and essentially ready for harvest. The testimony of the Claimants was not contradicted and the grain prices were stipulated. The damages as to each Claimant supported by the testimony are accurately reflected in the calculations contained in Claimants' brief and essentially are as follows:

Brown-Mann 1980 crops:

Corn:

| | | |
|---|---|---|
| 60 acres x 110 bu. = 6600 bu. x $3.33 per bu. | | = $21,978.00 |
| Lost in harvesting = 500 bu. x $3.33 per bu. | | = 1,665.00 |
| Total value of corn lost - 1980 | | $23,643.00 |
| Less: combining expense 60 x $12.00 | = $720.00 | |
| hauling expense 7100 bu. x $.06 | = 426.00 | |
| Total offset to 1980 corn: | | 1,146.00 |
| Net loss - 1980 corn - landlord & tenant | | $22,497.00 |

Soybeans:

| | | |
|---|---|---|
| 30 acres x 40 bu. = 1200 bu. x $8.09 per bu. | | = $ 9,708.00 |
| Less: combining expense 30 x $10.00 | = $300.00 | |
| hauling expenses 1200 bu. x $.06 | = 72.00 | |
| Total offset to 1980 soybeans: | | 372.00 |
| Net loss - 1980 soybeans - landlord & tenant | | $ 9,336.00 |
| Net loss - 1980 crops - landlord & tenant | | 31,833.00 |
| Landlord's share of loss = $31,833 ÷ 2 = | | $15,916.50 |
| Tenant's share of loss = $31,833 ÷ 2 = | | $15,916.50 |

Sheedy-Mann 1980 crops:

Corn:

| | | |
|---|---|---|
| 25 acres x 110 bu. = 2750 bu. x $3.33 per bu. | | = $ 9,157.50 |
| Less: combining expenses 25 x $12.00 | = $300.00 | |
| hauling expenses 2750 x $.06 | = 165.00 | |

Total offset to 1980 corn: $ 465.00

Net loss - 1980 corn - landlord & tenant $ 8,692.50

Soybeans:

| | | |
|---|---|---|
| 20 acres x 40 bu. = 800 bu. x $8.09 per bu. | | = $ 6,472.00 |
| Less: combining expenses 20 x $10.00 | = $200.00 | |
| hauling expenses 800 bu. x $.06 | = 48.00 | |

Total offset to 1980 soybeans: 248.00

Net loss - 1980 soybeans - landlord & tenant $ 6,224.00
Net loss - 1980 crops - landlord & tenant $14,916.50

Landlord's share of loss: $14,916.50 ÷ 2 = $ 7,481.25
Adjustment—Tenant pays all hauling expense = + 106.50

1980 crop loss to Estate of Sheedy: $ 7,587.75
Tenant's share of loss: $14,916.50 ÷ 2 = $ 7,458.25

Adjustment—Tenant pays all hauling expenses = − 106.50

1980 crop loss to Stephan Mann: $ 7,374.75

Calhan-Anderson 1980 crops:

Corn:

| | | |
|---|---|---|
| 40 acres x 130 bu. = 5200 bu. x $3.33 per bu. | | = $17,316.00 |
| Less: combining expenses 60 x $12.00 | = $480.00 | |
| hauling expenses 5200 x $.06 | = 312.00 | |

Total offset to 1980 corn: 792.00

Net loss - 1980 corn $16,524.00

Soybeans:

| | | |
|---|---|---|
| 60 acres x 40 bu. = 2400 bu. x $8.09 per bu. | | = $19,416.00 |
| Less: combining expense 40 x $10.00 | = $400.00 | |
| hauling expenses 2400 x $.06 | = 144.00 | |

Total offset to 1980 soybeans: 544.00

Net loss - 1980 soybeans $18,872.00
Total loss of 1980 crops $35,396.00

The question of damages concerning the loss in June of 1981 requires a close examination of the existing case law. The original rule followed in Illinois seemed to be that when the crop was not up or where it is up but is not so matured that the product can be fairly determined, the measure of damages is the rental value of the land together with the value of the seed and labor expended in bringing the crop to the point where it was destroyed. *Young v. West* (1906), 130 Ill. App. 216; *Enright v. Toledo, P. & W. R. Co.* (1910), 158 Ill. App. 323.

This line of cases, however, appears to have been overruled to allow for the later and more flexible rule as shown by the supreme court case of *St. Louis Merchants' Bridge Terminal Association v. Schultz* (1907), 226 Ill. 409, 80 N.E. 879, in which it was determined that the measure of damages for growing crops which were totally destroyed by inundation is the value of the crops at the time they were destroyed, together with the value of the right of the owner to mature the crops and harvest them at the proper time. This rule has been consistently followed to date by the cases determining the question since that case. *See Johnson v. Sleaford* (1963), 39 Ill. App. 2d 228, 188 N.E.2d 230; *Kaiser Agricultural Chemicals v. Rice* (1985), 138 Ill. App. 3d 706, 486 N.E.2d 417.

The State's contention in its brief stating that the Claimants produced no records to substantiate their opinions is without merit. The Claimants as witnesses were highly credible, conservative, and fair in their testimony concerning damages. They testified without objection to the acreage of the crops to be planted and the costs of planting and harvesting the same. As such they have proved their damages by a preponderance of the evidence and the State's objections to Claimants' motion

for leave to file an amended petition are denied. We find that the 1981 calculations in Claimants' brief are accurate and they read as follows:

Brown-Mann 1981 crops:

Corn:

| | | | |
|---|---|---|---|
| 25 acres x 120 bu. = 3000 bu. x $3.25 per bu. | | | = $ 9,750.00 |
| Less: combining expense 25 x $12.00 | = | $300.00 | |
| hauling expense 3000 bu. x $.06 | = | 180.00 | |
| Total offset - corn planted - joint share | | | 480.00 |
| Net loss - 1981 corn planted - landlord & tenant | | | $ 9,270.00 |
| 85 acres x 120 bu. = 10200 bu. x $3.25 | | | $33,150.00 |
| Less: Fertilizer expenses 85 x $55.00 | = | $4,675.00 | |
| Herbicide expenses 85 x $12.00 | = | 1,020.00 | |
| Seed corn expenses 85 x $17.50 | = | 1,487.50 | |
| Combining expenses 85 x $12.00 | = | 1,020.00 | |
| Hauling expenses 1,200 x $.06 | = | 612.00 | |
| Total offset - unplanted corn acreage | | | $ 8,814.50 |
| Loss - unplanted corn - landlord - tenant | | | $24,335.50 |
| Loss - 1981 corn acres - landlord & tenant | | | $33,605.50 |
| Landlord's share of loss = $33,605.50 ÷ 2 | | | = $16,802.75 |
| Tenant's share of loss = $33,605.50 ÷ 2 | | | = $16,802.75 |

Farm operations not performed:

Adjustments to tenant's share:

85 acres not planted:

| | |
|---|---|
| Plowing: | 85 acres x $11.00 = $935.00 |
| Discing: | 85 acres x $10.00 = 850.00 |
| Planting: | 85 acres x $ 7.00 = 595.00 |
| Cultivating: | 85 acres x $10.00 = 850.00 |

25 acres planted:

| | |
|---|---|
| Cultivating: | 25 acres x $10.00 = $250.00 |

| | |
|---|---|
| Total of further tenant deductions | $ 3,480.00 |
| Net loss to tenant - 1981 crop: | $13,322.75 |
| Net loss to tenant - 1980 crop: | 15,916.50 |
| Total Net Loss - Stephan Mann, tenant: | $29,239.25 |
| Net loss to landlord - 1981 crop: | $16,802.75 |
| Net loss to landlord - 1980 crop: | 15,916.50 |
| Total Net Loss - Brown, landlord: | $32,719.25 |

Sheedy-Mann 1981 crops:

1981 crop:

| | | |
|---|---|---|
| 40 acres x 40 bu. = 1600 bu. x $7.09 | | = $11,344.00 |
| Less: combining expense 40 x $10.00 | | = 400.00 |
| Total to landlord-tenant after expenses: | | $10,944.00 |
| Landlord's net share 1981 loss = $10,944.00 ÷ 2 | | = $ 5,472.00 |

Tenant's share—unadjusted 1981 loss =
$10,944.00 ÷ 2 = $5,472.00

| | | |
|---|---|---|
| Less: cultivating 40 x $10.00 | = $400.00 | |
| Hauling expense 1600 x $.06 | = 96.00 | |
| Adjustments to tenant's 1981 share | $496.00 | |
| Tenant's net share of 1981 loss: | | $ 4,976.00 |

| | | |
|---|---|---|
| Net loss to landlord - 1980 crop: | $7,514.75 | |
| Net loss to landlord - 1981 crop: | 5,472.00 | |
| Total Net Loss to Sheedy estate: | | $12,986.75 |

| | | |
|---|---|---|
| Net loss to tenant - 1980 crop: | $7,374.75 | |
| Net loss to tenant - 1981 crop: | 4,976.00 | |
| Total Net Loss to Stephan Mann: | | $12,350.75 |

Calhan-Anderson 1981 crops:

| | | |
|---|---|---|
| 100 acres x 130 bu. = 13000 bu. x $3.25 | | $42,250.00 |

| | | |
|---|---|---|
| Less: cultivating 100 x $10.00 | = $1,000.00 | |
| combining 100 x $12.00 | = 1,200.00 | |
| hauling 13000 x $.06 | = 780.00 | |
| Total expenses 1981 corn: | $2,980.00 | |

| | |
|---|---|
| Net Loss - 1981 corn (before replanting) | $39,270.00 |

| | | |
|---|---|---|
| Costs - replant 20 acres (attempt to mitigate) | | |
| Planting: 20 x $7.00 | = $140.00 | |
| Seed: 20 x $17.00 | = 340.00 | |
| Total additional expense - 1981 crop: | | $ 480.00 |

| | |
|---|---|
| Total Net Loss - Calhan-Anderson 1981 crop: | $39,750.00 |
| Total Net Loss - Calhan-Anderson 1980 crop: | $35,396.00 |
| Total Net Loss: Calhan-Anderson: | $75,146.00 |

By reason of the foregoing it is hereby ordered that awards be, and hereby are, entered for the Claimants as follows:

| | |
|---|---|
| Stephan Mann - Tenant: | $29,239.25 |
| Irene Brown - Landlord: | $32,719.25 |
| Alice K. Sheedy Estate - Landlord: | $12,986.75 |
| Stephan Mann - Tenant: | $12,350.75 |
| Calhan-Anderson, Landlord & Tenant: | $75,146.00 |
| Total Award | $162,442.00 |